IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLACK AND SILVER IPHONE AND UMX MODEL U683CL CURRENTLY LOCATED AT THE ATF MARTINSBURG FIELD OFFICE | Case No. 3:20MJ26 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, **Seth Cox**, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since September 2014. I am a graduate of the Uniform Police Training Program and Criminal Investigator Training Program at the Federal Law Enforcement Training Program in Glynco, GA. This included training in the investigative techniques of criminal violations of the Gun Control Act (18 U.S.C ch. 44) and the National Firearms Act (26 U.S.C. ch. 53). Prior to joining ATF, I was an officer with the United States Park Police in Washington, DC for close to five years. I have a Bachelor of Arts in Criminology and a Master's in Public Administration from West Virginia University.

3. The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1) (felon in possession of firearm), 18 U.S.C. 922(d)(1) (transfer of a firearm to a prohibited person), 18 U.S.C § 922 (a)(6) (false statement in the acquisition of a firearm), and 18 U.S.C. § 924(a)(3) (willful receipt of firearm by out of state resident by unlicensed person) and 18 U.S.C. § (a)(5) (willful transfer of firearm by unlicensed person to another unlicensed out of state resident) have been committed, are being committed, and will be committed by Antoine BROWN, Jerome WINECOFF, Tyrone GREENFIELD, and Rashard WALDO. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched are a Black and Silver IPhone and UMX Model U683CL cellular phone referred to hereinafter as "the Devices." The Devices are currently located at the ATF Martinsburg Field Office evidence vault in Martinsburg, Berkeley County, WV.

6. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7. ATF and other law enforcement agencies have been involved in the investigation of Antoine BROWN, Jerome WINECOFF, Tyrone GREENFIELD, and Rashard WALDO since March 27, 2020. The investigation has involved the illegal purchase of firearms from a Federal Firearms Licensee (FFL) in West Virginia. One of these firearms has been recovered by law enforcement in Martinsburg, WV, shortly after BROWN purchased it in Inwood, WV.

8. On March 27, I investigated information provided from Ray's Guns about a potential straw purchase. Ray's Guns is federal firearms licensee (FFL) located at 5471 Tabler Station Road, Inwood, WV. Personnel from Ray's Guns stated that a subject, identified as Antoine Paul BROWN had been frequenting the store to purchase firearms.

9. Ray's Guns personnel reviewed BROWN's purchase activity after his recent visits to their store. BROWN had been purchasing multiple Taurus Model G2C pistols. I know from experience in firearms trafficking, this particular firearm is a commonly trafficked firearm because of its price and popularity. BROWN had been purchasing these firearms utilizing only cash.

10. On March 24, 2020, BROWN entered the store with an individual who would later be identified as Jerome Christopher WINECOFF. Ray's Guns personnel observed that BROWN and WINECOFF viewed firearms in the store together but appeared to try to distance themselves at times.

11. During this visit to the store, BROWN completed an ATF Form 4473 for a Taurus, Model PT111, 9mm pistol, serial number TWA21487. BROWN paid for the firearm in full but was put on a store delay for the firearm. BROWN was told he could retrieve the Taurus pistol at a later date. Also on this visit, BROWN took receipt of Taurus, Model G2C, 9mm

3

pistol, serial number TMW80077 he purchased on March 17, 2020.

12. BROWN and WINECOFF also looked at additional firearms and BROWN chose a FN, Model 5.7, 5.7x45 caliber pistol, serial number GKS0079756 to put on layaway. The purchase price of the pistol was $725.00 which BROWN put $125.00 down on for his next visit. BROWN would later admit that he was given cash by WINECOFF for the purchases.

13. Store surveillance would confirm BROWN exited with WINECOFF at the conclusion of these transactions. They both entered the red Ford Expedition in the parking lot area of Ray's Guns and exited the area.

14. I began to investigate BROWN's background and firearm purchases. On March 30, 2020, I contacted Investigator Derrick English of the Eastern Panhandle Drug & Violent Crimes Task Force (EPD&VCTF) to deconflict information on BROWN. Inv. English informed me that BROWN was known to drug investigations completed by EPD&VCTF in recent months.

15. BROWN had been using an address of 320 W. Stephens St., Martinsburg, WV for his current address per his ATF Form 4473's. I conducted a drive by of this residence and did not observe BROWN's red Ford Expedition.

16. I requested all firearm transactions from Ray's Guns completed by BROWN. Ray's Guns provided ATF form 4473 information for six firearms purchased by BROWN. Most notably five of firearms had been purchased in the last year. All five handguns since 2019 were Taurus handguns of similar model and caliber.

17. I contacted Ray's Guns to coordinate to see what time BROWN would be arriving at their store to pick up his firearm he was on hold for. It was arranged that BROWN would retrieve his firearm at 2pm on March 30. Due to the store closing because of COVID-19 concerns, firearm retrievals were made by appointment only at this time.

18. On this date, SA Keith Martin, West Virginia State Police (WVSP) Trooper Nicholas Campbell, and I setup in the area of Ray's Guns to conduct surveillance on BROWN. At approximately 2:05PM, I observed BROWN operating the red Ford Expedition he was known to use. BROWN was traveling southbound on Route 11 and turned onto Tabler Station Rd towards Ray's Guns.

19. BROWN retrieved his firearm from Ray's Guns and completed the final additions to the ATF Form 4473. BROWN took receipt of the Taurus, Model PT111, 9mm pistol, serial number TWA21487. BROWN exited the area and began to travel northbound on Route 11. Law enforcement in the area initiated mobile surveillance at this time.

20. At the intersection of Route 9 East and Grapevine Road BROWN failed to signal into the left turn lane. Trooper Campbell conducted a traffic stop at Grapevine Road and Recovery Way. BROWN was positively identified by his WV driver's license. Trooper Campbell conducted a warrant and driver's license check of BROWN and his driver's license privileges returned suspended out of West Virginia. Trooper Campbell asked BROWN if he had any weapons or drugs in the vehicle. BROWN informed Trooper Campbell that he had just purchased a firearm at Ray's Guns and the firearm was inside the vehicle.

21. BROWN was removed from the vehicle at this time for further investigation. I arrived on scene at this time to assist Trooper Campbell in the investigation. I questioned BROWN about his current address and BROWN indicated it was 732 Faulkner Ave., Martinsburg, WV. BROWN indicated he had not been living at the 320 W. Stephen St. address since September 2019.

22. I informed BROWN that I [sic] was aware BROWN had [sic] purchased numerous firearms at Ray's Guns. BROWN was visibly nervous and shaking profusely at this time. I

5

began to question BROWN about the need for all of his firearms and BROWN stated a number of his firearms had been stolen. I also questioned him about the most recent firearms purchase and BROWN tried to inform us that firearm was in South Carolina at a family member's house.

23. I informed BROWN at this time I did not believe information BROWN was conveying. I further identified myself as a Special Agent with ATF and informed BROWN that he had already committed felony offenses for falsification of background information on the Form 4473. Additionally, I explained the federal penalty for lying to a law enforcement officer pursuant to this investigation. BROWN stated at this time he wanted to cooperate and tell the truth about his firearms purchases.

24. At this time, BROWN was not handcuffed and was standing outside of his vehicle. I further informed BROWN he was not under arrest for firearm offenses but did still have pending driver's infractions with Trooper Campbell. BROWN stated that he understood and began to provide information about his firearm purchases. BROWN initially stated that he was providing firearms to unknown individuals from Washington DC. BROWN claimed that he was driving the firearms over to Washington DC near Orange St. SE and providing them to a black male that operates a bicycle in the neighborhood. I again informed BROWN I did not believe this information.

25. BROWN again started providing information about firearm recipients. BROWN had been providing firearms to subjects he only knew as "Tidy" and "Q." While speaking with BROWN an individual arrived on scene and approached SA Cox and Trooper Campbell. This subject was identified as Rashard WALDO. This subject stated he was on scene to retrieve the

vehicle BROWN was operating. WALDO was instructed to wait and soon the vehicle would be released to him.

26. Trooper Campbell and I continued to talk to BROWN about the firearms purchases. I asked BROWN if Tidy or Q had accompanied him to Ray's Guns last week and he stated Q had in fact accompanied him to the gun store. Again WALDO approached officers and inquired into the length of time until he could take the Ford Expedition. I again informed WALDO it would be shortly. As I was speaking with WALDO, I observed that the vehicle WALDO arrived in was bearing Washington DC registration. WALDO entered back into the passenger side of the vehicle.

27. I reconvened with Trooper Campbell and BROWN asked BROWN if "Q" was in the vehicle that just arrived and BROWN indicated that he likely was. Trooper Campbell made contact with the vehicle and observed the male in the driver's seat. Trooper Campbell recognized this individual to be the same individual that accompanied BROWN to Ray's Guns on March 24, 2020. I had shown Trooper Campbell a photo of this subject just prior to this operation. It was determined that Q was confirmed as WINECOFF, was present at the investigation scene.

28. Trooper Campbell and I again asked BROWN about firearms activity with WINECOFF to be sure of our identification of him. BROWN provided information that the firearm he had just purchased was slated to be given to WINECOFF and the Taurus, Model G2C, 9mm Pistol, serial number TMW8007, retrieved on March 24, had already been given to WINECOFF. Trooper Campbell recovered the Taurus handgun out of BROWN's vehicle and provided it to me. BROWN was put into handcuffs at this time and placed in Trooper Campbell's cruiser for containment at this time.

29. Berkeley County Sherriff's Office (BCSO) Deputy Jason Wolfe arrived on scene at this time. Trooper Campbell, Deputy Wolfe, and I made contact with WINECOFF and WALDO at this time to further ascertain their roles in this firearms trafficking scheme. WINECOFF and WALDO were detained due to unknown factor of them possible being armed at this time.

30. WINECOFF stated that his vehicle was recently rented and that they were in West Virginia to attempt to purchase a vehicle from a friend. Trooper Ryan Eshbaugh arrived on scene at this time and conducted a criminal history check through WVSP dispatch for WINECOFF. WINECOFF returned with a *Murder II* conviction out of Washington DC. I later confirmed this conviction through NCIC which indicated WINECOFF received 18 years of confinement. Follow up on March 31, 2020 with the DC Superior Court search tool also confirmed this information.

31. I informed WINECOFF that he was subject of a firearms trafficking investigation to which WINECOFF stated he did not know anything about firearms. I stated that was untrue and that I had photos of WINECOFF in a firearms store just from the week prior. WINECOFF replied that he was in the store but he still did not know anything about firearms. I asked WINECOFF if he could be around firearms and he stated that he could not. WINECOFF added he did not handle any firearms recently in the store and that he "was just looking." I attempted to garner cooperation in this firearms trafficking scheme by asking WINECOFF where the firearms were going to in Washington DC. WINECOFF stated he did not want to assist with any information.

32. I then spoke again with WALDO and WALDO informed me he was just visiting the area with WINECOFF. WALDO stated that he and WINECOFF were cousins. WALDO

8

stated he lived close to Washington DC in District Heights, MD. I asked WALDO again why he was trying to retrieve the vehicle and he only stated that he was called on his phone to come retrieve the vehicle. WALDO would not identify the individual who instructed him to pick up the vehicle and became very cryptic in his answers when I questioned about possible firearms activity.

33. I requested consent to search WALDO's cellular device to verify this information. At this time, I believed that additional co-conspirators in the firearms trafficking scheme were directing WALDO to attempt to retrieve the vehicle. Additionally, I had probable cause to believe that information about BROWN's potential arrest related to the firearm was also contained in WALDO's cellular device. WALDO refused consent to search his device. I seized the cellular device for later application of a search warrant.

34. Based on our investigation into BROWN's firearm purchases to include store surveillance of BROWN and WINECOFF purchasing firearms together, coupled with information provided on scene by BROWN, both BROWN and WINECOFF were taken into custody for violation of WV state code 61-7-10F for conspiring to acquire firearms on false pretenses from a licensed firearm dealer.

35. WINECOFF's cellular phone also seized at this time for future application of search warrant.

36. Later that evening, Trooper Campbell and I interviewed BROWN who continued to cooperate. BROWN provided information that "Tidy's" real identity was Tyrone GREENFIELD. GREENFIELD is a convicted felon. BROWN admitted that he has been conspiring with GREENFIELD and WINECOFF since April 2019 to straw purchase and traffic firearms. BROWN added that he often contacts GREENFIELD via cellular device using various

9

applications such as "whatsapp" to communicate about firearms purchases.

37. BROWN added that he called GREENFIELD when he was arrested and requested someone to retrieve the vehicle. Based on WALDO's admission, it is believed that WALDO and GREENFIELD communicated via cellular device about BROWN's arrest. This further illustrates WALDO's connection within this firearms trafficking scheme.

### *Device Location*

38. The Devices are currently in the lawful possession of the ATF. The Devices came into ATF's possession when seized during state arrest of WINECOFF and BROWN. I took the devices into custody at this time. ATF and WVSP have investigated this case jointly. I seek this warrant for an examination of the Devices, which will comply with the Fourth Amendment and other applicable laws.

39. The Devices are currently in storage at the ATF Martinsburg Field Office, 40 Compass Pointe, Martinsburg WV. In my training and experience, I know that the Devices have been stored in a manner in which their contents is, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the ATF and WVSP.

## **TECHNICAL TERMS**

40. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication

through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets,

and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

41. Based on my training, experience, and research, I know that the Devices have capabilities that allow it to serve as wireless telephone, digital camera, GPS navigation device, and PDA. In SA Cox's training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

42. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

43. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

14

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

44. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

45. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

46. In my training and experience, I know that persons that engage firearms trafficking utilize their cellular devices to engage in said business. The Devices are used as a daily means to contact customers and also contact suppliers to further facilitate their business. I also know firearms traffickers often use "straw purchasers" to initially purchase firearms from FFLs to conceal their identities within the trafficking process. I know that these firearm sales are brokered utilizing cellular phones to make contact and arrange meetings places for sales or transfer of the firearms after purchased by the straw purchaser at the respective FFL.

47. I also know from my training and experience that a smartphone is used to provide GPS directions native or secondary application to the Device. The location of the Device is often logged during the communication with the cellular network and the satellites and embedded within the Device. I know from my training and experience with cellular phone examinations that persons often utilize GPS based applications to provide directions, even when traveling on foot. I also know that photographic content within Device often contain metadata which can log GPS coordinates or locational data.

48. A physical search of the contents of the Devices, is only search analysis of the data contained within the device and not the cellular provider data which would be obtained through a separate legal demand. It is anticipated that GPS location information will be located in the Devices that can establish a nexus for firearm trafficking locations outside of the source area (Berkeley County, WV). Locations markers yielded will assist in determining possible locations of above mentioned trafficked firearms from West Virginia to outside areas to include Washington DC.

49. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
Seth Cox
Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives.

Subscribed and sworn to before me
on April 9, 2020:

_____
ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

1.      The property to be searched are a Black and Silver IPhone and UMX Model U683CL cellular phone referred to hereinafter as "the Devices." The Devices are currently located at the ATF Martinsburg Field Office vault in Martinsburg, Berkeley County, WV.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the Device described in Attachment A that relate to violations of 18 U.S.C § 922(a)(6), 18 U.S.C. § 922(g)(1), 18 U.S.C. § 922(a)(3), and 18 U.S.C. § 922(a)(5) and involve Antoine BROWN, Jerome WINECOFF, Rashard WALDO, and Tyrone GREENFIELD, including:

    a. lists of customers and related identifying information;

    b. types, amounts, and prices of firearms trafficked as well as dates, places, and amounts of specific transactions;

    c. any information related to disposition of firearms or ammunition (including names, addresses, phone numbers, or any other identifying information);

    d. any information recording Antoine BROWN, Jerome WINECOFF, Rashard WALDO, and Tyrone GREENFIELD's travel schedule or travel from March 1st 2019 to the present to include GPS locational data within the Devices; and

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.